MOULTON and others *vs.* NORTON.

On the 28th of February, 1842, C. and N. entered into an agreement, under seal, by which C. agreed to sell to N. his farm, for $6000, $375 of which was to be paid by the 1st of April, 1843. Of this latter sum, $200 was to be paid by the 1st day of June, 1842, but if not paid by that time, N. was to give his note for the amount. If C. should receive $375 from N. and the latter should choose to quit the premises, he was to be at liberty to do so, at the expiration of the year ending on the 1st of April, 1843, by paying said $375 to C. N. was to leave the dwelling house and two barns, with the farm, and the use of two stoves, and to have the stoves if he kept the place. And in case he built a fence he was to be paid for it out of the rent of the place, if he quit the premises. N. also agreed to inform C., by the middle of July, 1842, whether he kept the place according to the agreement, or not. *Held* that the agreement was a contract for the *sale* and *purchase* of the premises, and was not a *lease* thereof, so as to authorize a distress for rent.

*Held also*, that the provision giving N. the right to quit the premises at the end of the year, upon the payment of the $375 only amounted to a refusal of the farm to N. for one year, upon a forfeiture of the first payment; with a stipulation on his part to give notice, by the middle of July, if he should elect not to keep the premises.

An affidavit of the amount of rent due, annexed to a distress warrant, which purports to give the legal effect of a contract between the parties, without setting it out in *hæc verba* should, if it is claimed that the contract amounts to a demise, allege that fact.

It is not sufficient to set out a conditional contract, and an election by the tenant to lease, without alleging any specific demise, or agreement by which rent was reserved.

An officer, in making a distress for rent, under a landlord's warrant, does not act in the capacity of a public officer, but as a private bailiff of the landlord; and the landlord is, in effect, the distrainor.

A sheriff, therefore, is not responsible for the acts of his deputies, in serving distress warrants.

The legislature, in making it necessary that distresses should be made by certain public officers, did not intend to change the entire responsibility growing out of those proceedings, and with it the form of pleadings in actions to recover the property, but simply to narrow the circle of selection of the agents to be employed by the landlord.

An officer in justifying the taking of property under a distress warrant, for rent, is obliged to go back of his warrant, and show an actual *demise*, and *rent due*.

A joint action cannot be maintained against a sheriff and his deputy, for the acts of the deputy.

ERROR to the Oneida common pleas. Norton sued Moulton, Lewis and Carter, in the court below, in an action of trespass for taking a quantity of grain, hay, a span of horses, a cow and other property, and carrying away and converting the same. The defendants severally pleaded the general issue, and gave notice that the property was taken under and by virtue of a distress warrant issued by Carter, as landlord of certain premises before that time leased to Norton, which warrant was directed to the sheriff of the county of Oneida, or any one of his deputies, &c. directing and requiring them to distrain the goods and chattels of Norton liable to distress, for the sum of $200, the amount of rent claimed to be due and payable from him to Carter on the 1st of June, 1842, on and towards the rent of the premises for one year, commencing on the 1st of April, 1842, and terminating on the 1st of April, 1843; the

*Moulton v. Norton.*

whole rent of the premises, for the year, being $375. That such distress warrant was delivered to, and was executed by, the defendant Lewis, a deputy sheriff of the county of Oneida; and that the defendant Moulton was sheriff of said county. That Carter was the owner in fee of the demised premises, and that Norton was in the occupation thereof, as his tenant, at the time of the seizure of the property; that such property was seized as a distress for rent, and was not removed at the time of such seizure; that the said sum of $200 had been made by a sale of a portion of such goods and chattels, that the residue of the goods not sold were not removed from the demised premises, but were returned to Norton; that the said goods were appraised and sold in all respects according to law; that the $200 so due for rent had not been otherwise paid; and that the surplus moneys arising from such distress and sale had been paid by Lewis, the deputy sheriff, to Norton, and the same was accepted by him. The defendants also set out in their notice what they claimed to be a *lease* of the premises in question, from Carter to Norton, upon which, as they insisted, the rent distrained for, had accrued. It was in these words:

"Agreement made this 28th day of February, 1842, between Guy Carter, jun. of the town of Paris, of the first part, and Dennis Norton, of said town, of the second part, witnesseth, that the said party of the first part agrees to sell his farm known as the Nelton farm, containing one hundred and eighty acres of land in the town above mentioned, for six thousand dollars, to be paid as follows: three hundred and seventy-five dollars to be paid by the first of April, 1843, and two hundred dollars of the above is to be paid by the first day of June, 1842, but if not paid by that time the said party of the second part is to give his note on demand for the sum of two hundred dollars, and the remainder at the time first specified, if the party of the first part receives three hundred and seventy-five dollars from the party of the second part, and the party of the second part chooses to quit the premises he can do so at the expiration of the year, ending on the first day of April, 1843, by paying over said sum to the party of the first part. Said Norton is to

have the dwelling house and two barns with the farm, and the use of two stoves, and the stoves if he keeps the place, and the necessary fire wood for one family ; said Norton is also to have the use of two ploughs, one cart and a sled and drag also to use on said farm ; said Norton is to have from Carter what hay he wants to use during his spring work, by leaving half as much in the barn another winter for him, said Carter, in payment for the same.   Mr. Norton is to take possession April, 1842.   Said Norton is to have of said Carter what seed grain Carter has to spare, for sowing and to feed, &c.; and if said Norton keeps the place Carter is to have all the wood that is cut from the stump at the present time, and for the compensation for straightening a certain line.   Carter is to pay Norton three shillings per cord for cutting and cording three foot wood, and four cents apiece for cutting the saw logs twelve feet long, and by the side of said wood lot; if Norton builds a fence he is to be paid for it, if he quits the premises, out of the rent of the place ; Carter is to wait for the seed grain until the first day of October, 1842, without interest ; said Norton is to inform said Carter by the middle of July, 1842, whether he keeps the place according to the above arrangement or not.

In witness whereof, we have hereunto set our hands and seals this 28th day of February, 1842.

GUY CARTER, Jr. [L. S.]<br>DENNIS NORTON. [L. S.]"

That Norton entered and took possession of said premises by virtue of said contract, and continued to occupy the same up to the time of the seizing, taking, driving and carrying away the said goods and chattels.   That Norton informed Carter, in pursuance of the said contract and agreement, that he should not keep the place, and elected to rent the same ; that two hundred dollars of the rent became due and payable on the first day of June, 1842, and the remaining one hundred and seventy-five dollars at the expiration of the year ending on the first day of April, 1843 ; that said rent of two hundred dollars remained due and unpaid on the fifteenth day of November, 1842, and that Carter thereupon issued under his hand and

Moulton *v.* Norton.

·seal a warrant of distress for the collection of such rent. That the following affidavit was annexed to the distress warrant:

"State of New-York, Oneida County, ss.

Guy Carter, junior, of the town of Paris, in the county of Oneida, the landlord for whose benefit the distress mentioned in the annexed warrant of distress is to be made, being duly sworn, deposeth and saith, that he, this deponent, and one Dennis Norton, entered into a contract on or about the 28th day of February, in the year of our Lord one thousand eight hundred and forty-two, to sell his farm known as the Welton farm, containing one hundred and eighty-three acres of land in the town of Paris above mentioned, for six thousand dollars, and three hundred and seventy-five dollars of which was to be paid by the first day of April, 1843, two hundred of which was to be paid by the first day of June, 1842, but if not paid by that time the said Dennis was to give his note on demand for the sum of two hundred dollars, and the remainder at the time first specified, and if the party of the first part, this deponent, received three hundred and seventy-five dollars from said Dennis, and the party of the second part, said Dennis, chose to quit the premises, he might do so at the expiration of the year ending on the first day of April, 1843, by paying over said sum to this deponent; and said Norton was to have the dwelling house and two barns with the farm, and the use of two stoves, and the stoves if he kept the farm, and the use of two ploughs, one cart, sled and drag to use on said farm, and said Norton was to have from said Carter what hay he wanted to use during his spring work, by leaving half as much in the barn another winter for him, said Carter, in payment for the same; said Norton was to take possession the first day of April, 1842, and said Norton if he builds a fence by the side of a certain wood lot specified in said contract, is to be paid for it out of the rent of the place if he, said Norton, quits the premises; and the said Norton was to inform the said Carter by the middle of July, 1842, whether he should keep the place according to the arrangement made or not; and this deponent further saith that said Norton entered into the possession of said place pur-

Moulton *v.* Norton.

suant to said contract, and made his election not to purchase said farm as aforesaid, and informed this deponent of the same, and said Norton elected to rent said place for three hundred and seventy-five dollars for one year, two hundred dollars of which was payable on the first day of June last, and one hundred and seventy-five dollars was payable on the first of April next, the year to commence on the first day of April, 1842, and terminate on the first day of April, 1843; that the said two hundred dollars is due towards one year's rent of said place commencing on the first day of April, 1842, and terminating the first day of April, 1843; that the said two hundred dollars became due and payable on said year's rent of said place to said Guy Carter, junior, on the first day of June last, and is now due and payable; that no note has been given for said rent and same remains due and payable as above except the building of a certain fence by said Norton, which he will be entitled to have deducted from the residue of the rents next spring if he quits the premises; and this deponent further saith that the sum of two hundred dollars is due as aforesaid for the rent of said place as aforesaid, and that the premises in this affidavit and in the annexed warrant of distress mentioned are the same; and further this deponent saith not."

On the trial in the common pleas the taking of the property was proved, and the value thereof; and the defendants introduced the agreement between the parties, and the distress warrant, and proved the execution thereof; and they established most of the facts set forth in their notice. The jury found a verdict in favor of the plaintiff, against all the defendants, and assessed his damages at $352,90. And the defendants brought their writ of error.

*J. Ruger*, for the plaintiffs in error.

*Th. H. Flandreau*, for the defendant in error.

*By the Court*, PRATT, P. J. The contract under which the plaintiff below entered into the possession of the premises in

question, was clearly a contract to purchase, and not a demise. There is no part of it which assumes to demise, or reserve rent. It is somewhat informal and unfinished, but as far as we are able to make any thing out of it, it has all the essential ingredients of a contract to purchase. It assumes to sell the premises for a given consideration, a time for the payment of a portion of such consideration is specified, and although no time is mentioned for the payment of the residue, that is evidently an unintentional omission.

The only question that can arise in relation to the construction of the contract, grows out of that part of it which gives Norton the right to quit the premises at the end of the year, upon the payment of three hundred and seventy-five dollars, specified in the contract as the first payment. That, we think, only amounts to a refusal to Norton, for one year, upon a forfeiture of the first payment; with a stipulation on his part, to give notice by the middle of July, if he should elect not to keep the premises. There is no stipulation, in case Norton should elect not to keep the premises, that the contract shall be deemed a demise, or that the three hundred and seventy-five dollars shall be deemed rent reserved. The word rent is only once used in the contract, and then in a connection which, at most, leaves it very doubtful what was really intended by it. It would be giving that word altogether too much potency to hold that, notwithstanding the careless manner of using the term, it has the effect to entirely change the purport of the contract.

It was insisted, upon the argument, that at all events, after the middle of July, and after Norton elected not to keep the premises, he held as tenant, and not as purchaser.. If that were so, it would not alter the case. It is quite clear that up to that time he held as purchaser; and it was during that time, that the two hundred dollars, the sum for which the warrant of distress was issued, became due. That sum, therefore, accrued as purchase money, and not as rent; and Carter was bound by the agreement to take Norton's note for the same. How the mere change of the relation on the fifteenth of July from vendor and purchaser to that of landlord and tenant, should

Moulton v. Norton.

convert a debt due on the first of June previously, into rent reserved, with the right to collect the same by distress and sale, is more than I can comprehend. It would, in my opinion, require some express stipulation between the parties to convert a contract of that character into a demise *ab initio*, with all the rights growing out of that relation. Even where a party enters into the possession of land under an agreement to lease at a given rent, it has been held that the landlord cannot distrain for non-payment; that there must be an actual demise. (*Hogan* v. *Johnson*, 2 *Taunton*, 148. *Dunk* v. *Hunter*, 5 *B. & A.* 322.)

I think the affidavit is also defective. It sets out the contract, and an election to lease, but it does not set out any specific demise or agreement by which rent was reserved. It purports to give the legal effect of the contract, and not to set it out, in *hæc verba*. It should therefore, if it is claimed that the contract amounted to a demise, have alleged that fact. (5 *Hill*, 562.)

We are therefore of opinion that the proceedings were neither a justification to the party nor the officer. (*Sackett* v. *Barnum*, 22 *Wend.* 605.)

The question in relation to the liability of Moulton is not free from doubt. At common law, the landlord might distrain in person, or issue his warrant to any private person. By the laws of 1813, (1 *R. L.* 434, § 5,) after five days' notice of the distress, if the goods were not replevied the person distraining with the sheriff or under sheriff of the county, or with the constable or other officer of the town or place where such distress should be taken, (who were thereby required to be aiding and assisting therein,) should cause the goods and chattels to be appraised. The officer was to summon and swear the appraisers, and the overplus, after sale, was to be left in the officer's hands. By the revised statutes, (2 *R. S.* 500, § 3,) "every distress must be made by the sheriff, or one of his deputies, or by a constable or marshal of the city or town, who shall conduct the proceedings throughout." This makes it obligatory upon the party to call in the aid of the officer at the very commencement of the pro-

ceedings; and the reason for the change, given by the revisers, is that "by the act of 1813, these officers were called in at the appraisement, and that there seemed to be stronger reasons to require the protection of a disinterested officer, at the commencement of what is usually a severe proceeding." (*Revisers' Notes,* 3 *R. S.* 762, 2d ed.) The question then arises under this statute, whether the officer, in making the distress, acts in the capacity of a public officer or as a private bailiff of the landlord; whether the legislature, in making it necessary that the distress should be made by certain specified public officers, meant to change the entire responsibility growing out of these proceedings, and with it, of course, the whole form of pleadings in actions to recover the property; or to simply narrow the circle of selection of the agents to be employed by the landlord. In *Webber* v. *Shearman,* (6 *Hill,* 29,) this question was decided in the supreme court. In that case, the question arose upon the pleadings, but the point was necessarily involved in the decision. Justice Cowen, in giving the opinion of the court, held that the officer acted merely as bailiff of the landlord, and that the landlord was in effect the distrainor. This decision seems to conflict with the opinion of Justice Bronson in the case of *Van Rensselaer* v. *Quackenbush,* (17 *Wend.* 35.) It was there said that the landlord could not maintain an action against a third person who should, after distress, convert the goods; that the distress could only be made by a public officer; and that after distress the goods, like those taken under execution, were in the custody of the law, and the officer alone could have an action for their conversion. This decision was not necessary in the case, and was probably made without a very strict examination of the provisions of that statute. We think, therefore, that the construction of that statute given in the case of *Webber* v. *Shearman* is the correct one.

As it was observed in that case, at common law the landlord distrained in person, or by any agent he might see fit to employ, although in practice it was usual to employ an officer who was familar with that kind of business, as it is now to employ officers to make sales under personal mortgages. The

revised laws which provided for calling in the aid of an officer at the appraisal, treats the landlord as the party conducting the proceedings, and the officer as simply aiding and assisting him. The revised statutes change the law in regard to the time of procuring the aid of an officer, and make it necessary to employ the officer at the commencement of the proceedings ; but otherwise the landlord is spoken of as the responsible party. Section first gives the *landlord* the right to distrain.   By section 11, the *landlord*, in certain cases, is to provide a place for storing the goods distrained.   By section 12, he is authorized to distrain cattle or stock feeding upon any common appurtenant ; and section 28 provides that where the rent is justly due any irregularity by the *party* or his *agent*, distraining, shall not render the distress unlawful.   As the proceedings are to be conducted throughout by the officer, any irregularity must be the immediate act of such officer.   Yet in this section it is treated as the act of the party himself, or his agent.   The landlord, therefore, throughout the statute in question, is spoken of and treated as the responsible and acting party, and the officer as simply aiding and assisting him.

Again ; it is provided that the warrant of distress shall be served by the *sheriff*, or *one of his deputies.*   If the warrant is to be deemed process, in the ordinary sense of the term, and issued to the sheriff in his official character, it would not have been necessary to mention his deputies as persons who might serve it.   They would be entitled to serve it by virtue of their office.   Again ; if it is process, the officer would be protected whenever the warrant was regular on its face, and accompanied by a regular affidavit.   Yet the late supreme court, in the case of *Webber* v. *Shearman,* decided, and we think correctly, that the officer, in a suit against him, would be compelled to go back of his warrant and show an actual demise, and rent due ; that in pleading to a declaration in replevin he should avow as formerly, in the name of the landlord, and make cognizance as his bailiff.   If, therefore, we are right in this view of the case, the officer acts in such cases merely as bailiff of the landlord, and not as a public officer in the execution of legal process, and

Moulton *v.* Norton.

the sheriff therefore is not responsible for the acts of his deputies in serving distress warrants.

A sheriff is not answerable for any default of his deputies, unless it be a default in executing the power lawfully derived from the authority of the sheriff, under which the deputy acts. When he undertakes any duties not resulting from the duties of his office the sheriff is not responsible. (*Allen on Sheriffs,* 86, *and cases cited.* 4 *Mass. Rep.* 60. 7 *Id.* 123.) He ought not to be held responsible for the acts of the deputy, unless his redress against him and his sureties be clear and unquestionable. (7 *Cowen,* 746.) It follows, therefore, that the sheriff in this case ought not to have been made a party.

There is another point, which was not discussed upon the argument, but which I am inclined to think is equally fatal to the case of the defendant in error. Although the sheriff is liable for the acts of his deputies in certain cases, and the party aggrieved has his action against the sheriff or his deputy at his election, yet I apprehend he is not entitled to maintain a joint action against them. This point has not, to my knowledge, been decided in this state; but in the case of *Phelps* v. *Campbell,* (1 *Pick.* 62,) it was expressly decided that the sheriff and his deputy, in such cases, were not jointly liable. And the reasons given for the decision in that case, I think, are founded on correct legal principles. (*See Cowen & Hill's Notes,* 823; 13 *Mass. Rep.* 49; *Allen on Sheriffs,* 88.)

The decision of the court below being wrong as to the defendant, Moulton and the judgment being entire, it must be reversed as to all the defendants. (5 *Hill,* 441. 1 *Denio,* 527.)

Judgment reversed.